MEMORANDUM OF DECISION RE: COTERMINOUS PETITION
I. INTRODUCTION
This case presents a coterminous petition filed on April 9, 1998, by the department of children and families (hereinafter referred to as the "petitioner" or "department") which sought an adjudication that Michael M. who was born on February 14, 1998, is a neglected child and that the parental rights of his parents, Terri M., age 23, and Michael H., age 24, be terminated.
Prior to trial, the termination petition as against respondent father was dismissed on legal grounds, however, petitioner continues to seek termination of respondent mother's parental rights and the commitment of Michael to petitioner pursuant to applicable statutory and-case law.
II. HISTORY OF PROCEEDINGS
On the date of filing of the coterminous petition the court (Swienton, J.) issued an order of temporary custody and found that Michael was suffering from serious physical illness and was in immediate physical danger from his surroundings. General Statutes § 46b-129 (b). That order was confirmed on April 15, 1998, at which time preliminary steps were issued to mother (Exhibit C-1) and genetic testing was ordered as Michael H. was questioning paternity which, at the commencement of trial, was no longer an issue.[2] On May 6, 1998, the court (Swienton, J.) ordered that no visitation between respondent mother and Michael be permitted pending the completion of a psychological evaluation by mother which the court also ordered. Upon completion, visitation between mother and child would be permitted only as approved by the child's pediatrician and the petitioner. Respondent father had been incarcerated five months prior to Michael's birth and remains incarcerated. On September 22, 1998, a pretrial was conducted by Judge Brenneman. On February 11, 1999, the court granted respondent father's motion to strike the petition seeking to terminate his parental rights. Since the only ground claimed against the father was abandonment and since father had been incarcerated prior to his son's birth, the court (Swienton, J.) ruled that incarceration alone could not constitute abandonment and could not provide the sole basis for termination CT Page 3564 of his parental rights.[3] The court thereafter (Brenneman, J.) on March 29, 1999, granted respondent father's Motion to Dismiss the termination petition as against him, said motion having been granted "without prejudice."
Trial commenced on May 14, 1999, at which, pursuant to an earlier agreement, the parties stipulated to an amendment by petitioner to add the allegation to the coterminous petition that Michael M. was uncared for within the meaning of General Statutes § 46b-120 (9). The court granted the amendment, subject to filing the appropriate pleading on or before June 4, 1999.[4]
Subsequent trial dates were July 9, 1999, and August 6, 1999, on which the presentation of evidence was concluded, a full transcript was ordered to be made available to the court and all counsel and a briefing schedule, subject to receipt of the transcript, was ordered.[5] By December 24, 1999, the court had received all briefs.
It should be noted in the history of this case that at the time of the birth of Michael M. a neglect proceeding was pending in this court relative to respondent mother's first child, Marcus M., who was born on November 2, 1994, and was not fathered by Michael H. An order of temporary custody was entered by the court in September 1997, and on November 17, 1997, Marcus M. was adjudicated by the court (Sheldon, J.) a neglected child and was committed to the petitioner. At that time mother was issued certain "expectations" pursuant to General Statutes § 46b-129
(b). (Exhibit — State's #3.) Since that time the department has filed a petition seeking the termination of the rights of both of the parents of Marcus M. That case was tried in the Child Protection Session at Middletown (Schuman, J.) and resulted in the court granting the petition on December 21, 1999. An appeal of that decision was filed by mother with the appellate court and is currently pending. Marcus' father had consented to the termination of his parental rights.
It should also be noted in the history of this case that while this case and that involving Marcus M. was pending, a third child was born to Terri M. on January 27, 1999, fathered neither by respondent father or the father of Marcus. A neglect/uncared for petition was filed by the petitioner on January 29, 1999, on which date this court issued an order of temporary custody (DiPentima, J.). A transfer of the guardianship of that child, Xavier S., was ordered on June 8, 1999 (Brenneman, J.). A motion to revoke the guardianship is currently pending in this court.[6]
CT Page 3565
In the instant case the court finds that mother and father have appeared and have court-appointed attorneys, as does Michael M. The court has jurisdiction in this matter. There is no pending action affecting Michael's custody in any other court.
The termination petition, by virtue of the court's dismissal, is no longer pending against respondent father and, as he was not the custodial parent at any time in Michael's life, father, prior to commencement of trial, chose to remain silent relative to the allegations in the neglect/uncared for petition. See Practice Book § 33-1(b). In re David L., 54 Conn. App. 185, 188
(1999). Mother denies the allegations in the coterminous petition, as amended, and is vehemently opposed to the termination of her parental rights.
The neglect aspect of the petition alleges that Michael was abandoned; was being denied proper care and attention, physically, educationally, emotionally or morally; was being permitted to live under conditions, circumstances, or associations injurious to his well-being and was abused. General Statutes § 46b-120, subparagraph (3) and (8). The uncared for allegations of the amended petition charge that Michael's home cannot provide the specialized care which his physical, emotional or mental condition requires. General Statutes § 46b-120 (9). The statutory ground upon which the petitioner based its allegations made against Terri M. in its termination petition and urges this court to find is that Michael has been denied, by reason of an act or acts of parental commission or omission including, but not limited to, sexual molestation or exploitation, severe physical abuse or a pattern of abuse, the care, guidance or control necessary for his physical, educational, moral or emotional well-being. General Statutes § 17a-112 (c) (3) (C).
The court heard from the case social worker, an investigative social worker, a registered nurse and two treating pediatricians, each of whom were called by petitioner. The court having read the petitions, as amended, having reviewed the twenty-nine (29) exhibits admitted into evidence and having considered the testimony of said witnesses which comprised 425 pages of transcript, does make the following findings.
III. NATURE OF COTERMINOUS PROCEEDING
Section 33-12 of the Practice Book provides: CT Page 3566
 When coterminous petitions are filed, the judicial authority first — determines whether the child is neglected, uncared for or dependent by a fair preponderance of the evidence; if so, then the judicial authority determines whether statutory grounds exists to terminate parental rights by clear and convincing evidence; if so, then the judicial authority determines whether termination is in the best interest of the child by clear and convincing evidence. If the judicial authority determines that termination grounds do not exist or termination is not in the best interest of the child, then the judicial authority may consider any of the dispositional alternatives available under the neglect, uncared for or dependent petition by a fair preponderance of the evidence.
In this case, the court must first determine whether the petitioner has proven by a fair preponderance at least one of the four grounds alleged in the petition that forms the basis for the claim that Michael was a neglected child. The court must then determine whether the petitioner has proven by a fair preponderance of the evidence that Michael was uncared for. If the court finds that Michael was neither neglected nor uncared for, then the court would dismiss both the neglect/uncared for and termination petitions as the child would no longer be "in the custody of the Commissioner of Children and Families in accordance with General Statutes § 46b-129. . . ." General Statutes § 17a-112 (a). If the court finds that Michael was either a neglected or uncared for child, the court would defer disposition on the neglect/uncared for petition and must then determine whether the petitioner has proven by clear and convincing evidence the statutory ground alleged in the termination petition provided in § 17a-112 (c) (3) (C). If the court determines that the petitioner has not met its burden of proof on this issue, then the court would dismiss the termination petition and would move to disposition by considering the dispositional alternatives provided in § 46b-129 (j) based upon the finding of neglect or uncared for.
If the court finds that the petitioner has proven the statutory ground alleged in the termination petition by clear and convincing evidence and if the court further finds that petitioner has established by clear and convincing evidence either that it has made reasonable efforts to reunify Michael with his mother or that Terri M. is unable or unwilling to benefit CT Page 3567 from reunification, then the court would move to the disposition phase of the case. The court, however, prior to doing so, would also have to find, by clear and convincing evidence, that the one year requirement previously provided in § 17a-112 (c) should be waived as provided in former § 17a-112 (d).[7]
In the dispositional phase if the court makes the adjudicatory findings referred to in the previous paragraph, the court would have to determine, by clear and convincing evidence, whether termination of the parental rights of respondent mother is in the best interest of Michael M. In making that determination, the court would have to consider and make, by clear and convincing evidence, the seven findings provided in § 17a-112 (d), formerly sub-paragraph (e).[8] If the court, having made the required findings, does decide to terminate the parental rights of Terri M. without terminating those of Michael H. or if the court does not terminate respondent mother's parental rights and, therefore, dismisses that petition, the court would, again, return to the neglect/uncared for petition to consider the dispositional alternatives provided in § 46b-129 (j).
IV. FACTS
Prior to reviewing and commenting on those facts found by the court to be applicable directly to Michael M. and his relationship with his mother, it is instructive, probative and relevant to review the historical setting into which Michael came into the world — all of which has been adduced from the documentary evidence and testimony presented in this case.
In January 1997, the department opened a case pertaining to then two year old Marcus M. amid concerns of substance abuse by Terri M., domestic violence against Terri M. by Marcus' father and poor judgment and parenting skills by mother. From January to September 1997, while the department continued its involvement, mother and child relocated several times without notice. On September 8, 1997, the department removed Marcus from mother's care as a result of Terri M. and her boyfriend, Michael M., being arrested during a raid by Torrington police in which cocaine and weapons were seized; one of the weapons, a hand gun, had been used in a homicide. An order of temporary custody was issued within 96 hours and on November 17, 1997, the court (Sheldon, J.) found that Marcus was a neglected child and committed him to the custody of the Commissioner of Children and Families. Mother at that time was issued "expectations" which she CT Page 3568 signed immediately below the following "Notice to Parents":
 If you fulfill the court's expectations, you will improve your chances of regaining or permanently keeping custody of your child. Failure to achieve these goals will increase the chance that a petition may be filed to terminate your parental rights permanently so that your child may be placed in adoption. If you need help in reaching any of these expectations, contact your lawyer and/or DCF worker. (Exhibit — State's #3.)
Among the court-ordered expectations were keep whereabouts known to petitioner, participate in parent, individual and drug/alcohol counseling, cooperate with Susan B. Anthony domestic violence services and secure and maintain adequate housing and income. Terri M. was incarcerated until her sentencing on December 19, 1997. She pled to Risk of Injury to a Minor and received a suspended sentence after time served and four years probation. Michael H. was convicted of Sale of Narcotics and of Stealing a Firearm and on December 23, 1997, received a fifteen year sentence, suspended after serving five years to be followed by five years probation.
In November 1997, the school district evaluated Marcus and found that he was functioning below normal development expectation in self-help, motor, language and cognitive skills and speech articulation, yet his mother had consistently refused to have him evaluated. During subsequent testing conducted in February 1998, Marcus ranked in the lowest one percentile in all areas tested, qualifying him for special education services and speech therapy.
Michael M. was born at 38 weeks gestational age on February 14, 1998, at a birth weight of six pounds, ten ounces at Charlotte Hungerford Hospital. On discharge he weighed six pounds, six ounces. (Exhibit — RM #7.) As the department had a pending case with respondent mother, on February 18th, Kevin Real, an investigator with the department, visited mother and Michael while they were residing temporarily with mother's aunt in Waterbury. Mother informed Real that she would have an apartment for her and her son in Torrington in three weeks. Mother also told the investigator that she set up an appointment for Michael with Dr. Curi, a pediatrician in Torrington. Mother promised the investigator that she would re-apply for state financial aid which was terminated due to her move to Waterbury without CT Page 3569 providing the requisite notice. The department, through Real, voiced its concerns as to adequate housing and income as the same were an important part of the court-ordered expectations in Marcus' case. A subsequent check by Real with the manager of the proposed Torrington apartment complex revealed that mother's application was not given priority status and that the availability of an apartment for her was non-existent. On March 5, 1998, Leanne Charette, the caseworker assigned to Terri M. by the department, made her third visit after that of Real amid concerns that Terri M. had not as yet secured an apartment and that mother had not taken Michael for his two-week medical visit to any doctor. Charette arranged for an examination and took mother and child the next day to the office of Linda Matthews, a Waterbury pediatrician. Matthews examined the child who then weighed six pounds, fifteen ounces.
On March 18, 1998, mother appeared in this court for Marcus' case and was reminded by the court (Sweinton, J.) of the importance of complying with the court-ordered expectations and of cooperating with the department. Mother had been avoiding her caseworker and was not returning her calls. Mother, having promised to do so, had not pursued obtaining W.I.C. benefits (food, formula, diapers) or financial assistance from the state. The caseworker drove mother to a Waterbury apartment which she had obtained two weeks prior. The worker noted that the apartment was dirty and full of garbage and debris. The worker also noted that Terri M. had not properly secured Michael in the car seat and voiced concerns to mother that "he looked tiny." Due to her concerns, the caseworker again visited mother and Michael on Monday, March 23, 1998, accompanied by Jeri Dudics, a registered nurse who was a consultant to the department. Dudics examined Michael and testified that he appeared underweight as evidenced by a distended stomach and loose skin. She advised mother to have the child examined by Matthews by the end of the week. Mother voiced no concerns relative to the child experiencing diarrhea or vomiting. Dudics testified that mother's account as to Michael's feeding intake and schedule were not consistent with the nurse's findings. Mother did not follow up and did not make an appointment or even call Matthews, the child's then pediatrician; instead, mother went to the emergency room (ER) at St. Mary's Hospital on Thursday, March 26, 1998.
The record of that visit (Exhibit — RM #6) reveals that the child weighed seven pounds, one and one-quarter ounce. Mother voiced complaints of a drop of blood on Michael's penis, diarrhea CT Page 3570 and diaper rash. A diagnosis of failure to thrive, thrush and diaper rash was made and mother was advised to change Michael's formula to "pro sobee" and was told to bring the child to the Children's Health Center at the hospital on the next day for full examination. On the morning of April 3, 1998, when the caseworker next visited mother and Michael with voiced concerns as to Michael's health, mother's failure to follow-up with Matthews and mother's failure to access services, Charette saw that Michael was thinner and "looked wasted." Mother told the worker about the ER visit, but did not inform her of the failure to thrive diagnosis or the instruction to have the child fully examined at the health center on the next day. After leaving the apartment, Charette was able to schedule an appointment for Michael with Matthews for that afternoon and left a note advising mother that she would pick them up at her apartment to drive them to the appointment. Upon arrival at the appointed time, mother and child were not home, however, mother left a note on the door that she was going to W.I.C. to see about benefits. Thereafter, the caseworker confirmed that mother did not go to W.I.C. Meanwhile, St. Mary's Hospital, in following up on the emergency room visit, had called mother and on April 3, 1998, sent a nurse to visit her to urge her to bring Michael to the Children's Health Center. After eleven days had passed since the ER visit, mother did take Michael to the health center on April 6, 1998, and told the attending staff pediatrician, Sandra Carbonari, that she brought the child for his shots. Carbonari, however, obtained the ER record, as she was very concerned as to Michael's appearance.
Carbonari testified at the trial, assisted by the report of her examination. (Exhibit — State's #1.) She stated that Michael appeared thin and wasted, his abdomen was distended and there was no fat under his skin. He weighed six pounds, six ounces (his discharge weight); normally, a child at Michael's age of fifty-one days old would weigh nine to nine and one-half pounds. Mother told Carbonari that Michael was taking Enfamil with iron, four to six ounces every four to six hours, which, said doctor testified, was not consistent with her findings. Mother also informed Carbonari that she was unable to obtain "pro sobee" which Carbonari stated was readily and widely available. Carbonari diagnosed "severe failure to thrive," immediately admitted Michael and notified the department. (Emphasis added.) Michael was a patient at the hospital from April 6 to April 13, 1998, during which time he underwent a variety of diagnostic tests to determine if there was an organic cause of his weight loss. No intervening procedures were administered other than feeding the CT Page 3571 child on a regular schedule. Michael was noted to have taken his original formula with no difficulty, no neurological impairments to proper feeding were found and he was noted to have a "positive suck." (Exhibit — State's #2.) Thrush, which is a yeast infection, was treated with an oral solution. Carbonari testified that, after a week in the hospital, with proper feeding, Michael weighed seven pounds, three ounces — a gain of thirteen ounces. Carbonari said, it then became "very clear" that no underlying abnormality accounted for Michael's weight loss and that the cause of the same was that the child was not being fed adequate calories. It is noteworthy that Michael weighed seven pounds, fourteen ounces on April 17, 1998, and on April 24, 1998, weighed eight pounds, eighteen ounces — both weights recorded at the health center during post hospitalization visits by Michael and his foster mother. The order of temporary custody was issued on April 9, 1998; Michael has been in foster care since that date.
As previously noted, court-ordered expectations were already in effect when Michael M. was born, having been issued on November 17, 1997, in the case of Marcus M. (Exhibit — State's #3.) Preliminary steps were issued in Michael's case on April 16, 1998 (Exhibit — C-1). Both obligated respondent mother to engage in individual and parenting counseling, group counseling for domestic violence and drug and alcohol counseling. Both also obligated Terri M. to secure and maintain adequate housing and income, to cooperate with petitioner and to keep her whereabouts known to petitioner. The department set up an appointment for Terri M. at the Behavioral Health Center at Charlotte Hungerford Hospital which she did attend as a result of which individual psychotherapy was recommended and a schedule of sessions was arranged. The initial evaluation was done on December 2, 1997; respondent mother canceled sessions on 12-12-97, 12-22-97, 1-2-98 and 1-30-98 and was late for her session on 2-6-98. She attended a session on February 10, 1998, but did not return. Despite continuous prompting by the department (Exhibits — State's #4 thru #18) mother had failed to re-engage with an individual therapist. The caseworker made four separate appointments at the Susan B. Anthony domestic violence program prior to Michael's birth, none of which were kept by Terri M.
In September 1998, five months after Michael was removed, a referral for drug counseling was made by petitioner to the Morris Foundation in Waterbury. Terri M. enrolled in the Women's Group, and from September thru December of 1998, attended ten out of thirteen sessions. She attended, however, only two of nine of the CT Page 3572 meetings scheduled between January and March of 1999. Between April and June of 1999, respondent mother attended only two of ten scheduled meetings resulting in her discharge from the program.
As to parenting services, in April 1997, the department referred Terri M. to a parent aide program and scheduled an intake interview for May 14, 1997, which was not attended by respondent mother as she had moved her residence without notice to the department and failed to re-engage with the department until shortly before her arrest in September 1997, resulting in the removal of Marcus. After Michael's removal in April 1998, respondent mother was referred by petitioner to a parenting program known as "Family Ties." Mother's attendance in June and July was so sporadic that the provider was compelled to close the case. Terri M., after continuous prompting by the department re-enrolled in the program in September 1998, however, as of January 1999, had ceased attending.
As to adequate housing, at the time of Michael's birth in February 1998, Terri M. had temporary housing only. She and Michael were staying with the maternal great aunt while Terri searched for an apartment. When respondent mother found an apartment in Waterbury in early March, the caseworker noted, several weeks after mother moved in, that the apartment was dirty and cluttered with garbage and debris. Ten months later, on January 29, 1999, Terri's probation officer was compelled to contact the department due to concerns as to the safety of Terri's third child, Xavier, as the officer found the apartment to be unsanitary and unclean. The complaint resulted in a referral to the department, a 96 hour hold and an order of temporary custody issued by the court (DiPentima, J.) on January 29, 1999. Three months after her third child was removed, on April 26, 1999, the caseworker noted the filthy condition of the apartment in that the same was cluttered with garbage and dirty dishes. (Exhibit — State's #23, page 3.)
As to adequate income, at the time Marcus was removed in September 1997, Terri M.'s sole source of income was from the drug money earned by Michael H. When Michael M. was born in February 1998, respondent mother was receiving some financial aid from the state, however, with her move to Waterbury without notice to that department, those benefits were lost. Despite much urging by the caseworker, mother failed to take the steps necessary to reinstate those benefits prior to Michael's removal. In April CT Page 3573 1999, Terri M. worked at Burger King but was fired after a month for excessive absenteeism.
From March 18, 1998, to April 30, 1999, due to mother having no phone, Charette sent numerous letters (Exhibits — State's #4 thru #18) to Terri M. urging her to access various service providers named therein for such services as individual counseling, domestic violence and parenting and urging mother to schedule meetings with the caseworker. Sporadic participation in some of the offered services (particularly, during the fall of 1998) has been described above, however, Terri M. has not participated in any of these services since December 1998. (Exhibit — State's # 23, page 4.) For a six week period, from May 1 to June 15, 1998, Terri M. made no contact with the department despite her agreement to do so and despite two letters from Charette soliciting such contact. (Exhibit — State's #7 and #8.) In August 1998, Terri M. again promised to keep in regular contact with her caseworker, however, in a nineteen week period that followed, respondent mother contacted the department three times; two of those occasions were to arrange visitation with Marcus. According to Charette, respondent mother rarely asks about Michael's health and welfare.
Included also in the court-ordered expectations in Marcus' case and the steps in Michael's case was the invitation to "visit the child as often as DCF permits." As noted earlier, Terri M. was, by court order, not permitted to visit with Michael until she participated in the psychological evaluation, also court-ordered, conducted by David Mantell. The evaluation was scheduled for June 4, 1998; respondent mother did not show up. A new date was set for August 18, 1998, and mother, once again, failed to attend. (Exhibit — State's # 21.) Terri M. has not seen Michael since April 8, 1998. A third try to get mother to show up for and participate in an evaluation was not made by the department.
Dudics, the nurse consultant to the department, has continued to follow-up on Michael's medical care, He is considered by the department "a medically fragile child' which qualifies him for special services. He has been residing with foster parents who have been specially trained and licensed to care for a child having substantial medical needs. His treating physician since July 9, 1998, is Claire Bailey and her associate physicians at the Center For Pediatric Medicine in Danbury. Michael is also being followed by a pulmonologist, gastroenterologist, neurologist, a geneticist and a developmental pediatrician. CT Page 3574
The most serious of Michael's medical ailments is asthma for which he requires an inhaler and daily nebulizer treatments which are administered by his foster mother with the use of a so-called "spacer device" using a tube, mask and pump. He requires an ultra-clean environment completely lacking of dirt and dust and an air-conditioned room. Michael also suffers from multiple ear infections, food intolerances, has an oversize head, and loses his balance. He has oral motor tone problems (difficulty coordinating tongue and mouth) and may have a chromosome irregularity. Bailey, after a review of the St. Mary's Hospital record, agreed with the failure to thrive diagnosis and agreed that the condition had no organic cause. Bailey testified that all of the above medical conditions referred to herein, taken together, were not of such severity as to cause the degree of the failure to thrive suffered by Michael.
V. ADJUDICATION
"Neglect [and uncared for] proceedings, as do termination of parental rights cases, consist of two phases: adjudication and disposition." In re David L., supra, 54 Conn. App. 191. In the adjudicatory phase, the court is limited to the consideration of events which preceded the filing of the neglect or uncared for petition or the latest amendment thereto. Practice Book §33-3. This court, therefore, has considered only those events which have taken place prior to April 9, 1998, in adjudicating the four grounds of neglect alleged by petitioner as such was the date on which the coterminous petition was filed. As to the uncared for allegation, the court will consider all those events which took place prior to July 9, 1999, the date on which petitioner filed its amendment which added that allegation. The adjudication date relative to the termination of parental rights petition is also April 9, 1998, as no amendment was filed to that petition.
A. The Neglect Allegations
The petitioner claims that Michael M. was abandoned by his mother, having never been in the physical custody of his father. The term has been defined as "such conscious disregard and indifference [by a parent] to his parental obligations as to evince a settled purpose to forego his obligation and duties to his child." (Internal quotation marks omitted.) In re JuvenileAppeal (Docket No. 10155), 187 Conn. 431, 441 (1982), citingHamby v. Hamby, 264 S.C. 614, 618-619, 216 S.E.2d 536 (1975). CT Page 3575 "Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare." (Citation omitted.) In re Angellica W.,49 Conn. App. 541, 551 (1998). "A parent must maintain a reasonable degree of interest in the welfare of his or her child. `Maintain' implies a continuing, reasonable degree of concern." (Internal quotation marks omitted.) In re Michael M., 29 Conn. App. 112,121 (1992). The definition found in General Statutes §17a-112 (c) (3) (A) refers to abandonment (as a ground for termination of parental rights) as the failure to "maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child." The term, as used in § 46b-120 (8) (A) as a ground for neglect is not defined.
The common law and statutory definitions of abandonment do have in common the elements of reasonableness and concern as to the well-being of one's child. This court finds that petitioner has proven abandonment by a fair preponderance of the evidence. From the date of Michael's birth until the child was removed from her care by the petitioner, a period of nearly two months transpired during which Terri M. failed to follow thru with services necessary to her child's safety, failed to obtain adequate income, failed to properly attend to her child's medical care, and failed to satisfy her child's most basic need — his need to survive. While failing to provide proper sustenance to Michael, Terri M. was ignoring offers by department personnel to help her provide for Michael's proper care and was literally playing a shell game with Michael's doctors, i.e., failing to have her son followed by one medical provider who would regularly chart Michael's development and establish a baseline for growth. Testimony revealed that Terri M. provided three different accounts when asked to disclose Michael's feeding intake and schedule: She told Matthews the baby was fed three to four ounces of formula every one to one and one-half hours; she told Charette feeding consisted of three ounces every four hours; and she told Carbonari the baby was taking four to six ounces every four hours. Such conduct by mother, this court finds, was unreasonable, placed her child's life at risk and constituted "abandonment."
Petitioner next alleges that respondent mother "denied [her son] proper care and attention, physically, educationally, emotionally or morally. . . ." (Emphasis added.) General Statutes § 46b-120 (8) (B). Medical experts in this case all agree CT Page 3576 that Terri M. did not properly feed Michael. He suffered from starvation. (Exhibit — RM #1.) Bailey testified that Michael's weight loss was "striking" and should have been noticed by his caretaker. This court finds that this ground of neglect has been proven by petitioner by a fair preponderance of the evidence.
Petitioner also alleges that Michael was "being permitted to live under conditions, circumstances or associations injurious to his well-being. . . ." General Statutes § 46b-120 (8) (C). This court finds that petitioner has proven this ground of neglect by a fair preponderance of the evidence. Starvation is certainly injurious to one's well-being.
The final ground of neglect alleged by petitioner is that Michael M. was abused as that term is used in § 46b-120 (8) (D) and defined in § 46b-120 (3) as follows:
 "abused" means that a child or youth (A) has had physical injury or injuries inflicted upon him other than by accidental means, or (B) has injuries which are at variance with the history given of them, or (C) is in a condition which is the result of maltreatment such as, but not limited to, malnutrition, sexual molestation or exploitation, deprivation of necessities, emotional maltreatment or cruel punishment. . . .
(Emphasis added.)
Clearly petitioner has proven this ground of neglect by a fair preponderance of the evidence. During her examination of April 6, 1998, Carbonari found the child to be thin and wasted, to present with a distended abdomen and with no subcutaneous fat and testified that the cause of that physical condition was that Michael was not being fed adequate calories. Bailey testified that the symptomology described was that exhibited by children in countries suffering from famine. Michael M. suffered from malnutrition as a result of his mother's "maltreatment". See General Statutes § 46b-120 (3) (C).
As a consequence of his abandonment, lack of care and attention, living under conditions and circumstances injurious to his well-being and his abuse, this court finds that, as of April 9, 1998, Michael M. was a neglected child.
 B. The Uncared For Allegations
CT Page 3577
Petitioner alleges in its amendment filed July 9, 1999, that Michael M. was, as of that date, uncared for in that Terri M. cannot provide the specialized care which his physical, emotional and mental condition requires. General Statutes § 46b-120
(9). As previously described Michael M. suffers from a number of physical conditions which require a high degree of care and attention. Dudics stated that Michael's caretaker would need to navigate a number of systems and would need to communicate with all of those involved in Michael's care. Bailey testified that such caretaker would have to undergo training in order to develop the skills required to properly care for Michael. Bailey also stated that the responsibility of caring for Michael could be "an overwhelming job." She further stated that a caretaker for Michael would have to dedicate "full-time attention" to the task, would have to be organized, patient, possess good judgment and keep wellness and illness appointments with the child's doctor. Bailey was asked by the assistant attorney general whether a person with a history of substance abuse, criminal activity, transient residence, disobeying court orders and of failing to follow court expectations resulting in the removal of one child, only to have another child removed for failure to thrive, whether such a person would be capable of furnishing that degree of care which Michael requires. The pediatrician kindly and diplomatically offered that the person described would "not be an ideal candidate." As of July 9, 1999, Michael's needs were being met by two specially trained adult foster parents assisted by two older children — all of whom pitch in to provide said child with the care he requires. Given Terri M.'s past history of endangering the safety and welfare of one child, Marcus, and of imperiling the life of another, Michael; of refusing to take the necessary steps to acquire the skills necessary to properly parent her children; of failing to maintain a proper financial and household environment and of refusing to follow court orders purposed to promote the best interests of her children, Terri M. is seriously lacking in those qualities required of a caretaker for Michael. The court, therefore, does find that petitioner has proven by a fair preponderance of the evidence that Michael was "uncared for" as defined by § 46b-120 (9).
 C. The Termination of Parental Rights Petition
1. The Statutory Grounds:
The court must now consider whether petitioner has proven by CT Page 3578 clear and convincing evidence the statutory ground alleged against Terri M. as a basis for the termination of her parental rights — that Michael M. "has been denied by reason of an act or acts of parental commission or omission the care, guidance or control necessary for his physical, educational, moral or emotional well-being. . . ." General Statutes § 17a-112 (c) (3) (C). The petitioner also requests that the court find that a waiver of the one-year requirement be granted under the totality of the circumstances surrounding said child, said waiver being necessary to promote the best interest of said child.[9]
The right of a parent to conceive and raise his or her child is a fundamental right, far more precious than property rights. Inre Juvenile Appeal (83-CD), 189 Conn. 276, 284 (1983). Also fundamental is the right of a parent to care for and manage his or her children without the coercive interference of the awesome power of the state. Stanley v. Illinois, 405 U.S. 645, 651
(1972); Duchense v. Sugerman, 566 F.2d 817, 825 (2d Cir. 1977). In custody proceedings, the primary consideration is the child's best interest. Due to the fundamental nature of parental rights, however, prior to considering what is in the child's best interest, the court must first consider, in a termination proceeding, whether a statutory ground has been established. Once established by clear and convincing evidence, then, and only then, may the court consider "best interests" and whether termination should be ordered.
The statutory ground claimed by the petitioner forms the basis for a termination of parental rights where the evidence establishes specific acts of parental commission or omission which caused serious physical or emotional injury to a child. See, In re Theresa S., 196 Conn. 18, 25-27 (1985); In re KellyS., 29 Conn. App. 600, 614 (1992). Certainly acts of omission or commission which imperil a child's life and require immediate medical intervention to insure the safety and survival of the child must be included in the consideration of this statutory ground. Among the acts of omission by mother during the two month period from Michael's birth to his removal on April 9, 1998, which denied Michael the care necessary for his physical well-being were her failure to take the steps necessary to re-instate her state aid, her failure to maintain living quarters suitable for an infant's needs (i.e., free of dirt, debris and clutter), her failure to take the child for his required medical appointments and her failure to cooperate with petitioner in its efforts to assist mother in providing for Michael's safety and CT Page 3579 welfare.
Far and above those acts of omission, however, is the failure of Terri M. to provide her child on a daily basis with the amount of calories necessary, not only for his physical well-being, but for his very survival. Bailey testified that without the immediate medical care provided to Michael on April 6, 1998, by Carbonari, the child "almost certainly would have died!" Bailey also testified that among the possible long term effects from which a child suffering from failure to thrive may further suffer are psychomotor impairments, cognitive difficulties and learning disabilities. These deficits clearly will adversely effect a child's educational and emotional well-being in addition to his physical well-being. "[N]onorganic failure to thrive" has been described as "a condition of low body weight due to inadequate care and insufficient calorie intake that can have an adverse affect on brain development." In re Shyliesh H.,56 Conn. App. 167, 171 (1999).
On the occasions that Terri M. did seek medical attention for her son, only after much prompting by department personnel, she would, contrary to promises made by her, fail to take the child to the physician named by her. She did not have Michael examined by the same physician more than once. This court finds that these acts of commission by Terri M. delayed the diagnosis of failure to thrive and the resultant medical intervention to the extent that Michael's life was placed at great risk. Had one physician regularly followed Michael's development the state of starvation from which Michael suffered would not have been reached as an earlier medical intervention would have prevented it.
This court finds that the petitioner has proven by clear and convincing evidence that Michael M. was denied by reason of acts of commission and omission of Terri M. the care necessary for hisphysical, educational and emotional well-being. This court also finds under the totality of all the circumstances pertaining to Michael's lack of proper care while in the custody of his mother that a waiver of the one year requirement, previously provided in § 17a-112 (c), is necessary to promote Michael's best interest. Having neglected her first child due to her impaired parenting skills, poor judgment and dangerous associations, Terri M., during the two month period she was solely responsible for the care of her second child, engaged in acts of omission and commission which nearly killed that child. Given Michael's fragile medical condition and his resultant need for intensive CT Page 3580 care and given his mother's failure to meet his most basic need, i.e., the need for food, said waiver is most appropriate and clearly mandated by the facts and circumstances of this case.
2. Reasonable Efforts:
Having made the finding that the statutory grounds alleged as a basis for terminating mother's parental rights have been proven, the court cannot, as yet, consider the best interest issue unless and until the court makes the findings required by §17a-112 (c) (1) that the petitioner has made reasonable efforts to locate the parent and that such efforts were made to reunify the child with the parent unless the court finds that the parent is unable or unwilling to benefit from such efforts. As indicated, both the parents of Michael M. have been involved in these proceedings and have been furnished counsel.
In its termination petition, petitioner alleges in Paragraph 1 that respondent mother is unable or unwilling to benefit from reunification efforts. It should be noted that on April 9, 1998, the court (Swienton, J.) while issuing the order of temporary custody found that the petitioner made reasonable efforts to prevent or eliminate the need for Michael's removal. Judge Swienton provided Terri M. with the road map which mother needed to follow in order to make possible a reunification with Michael by issuing specific steps. (Exhibit — C-1.) Included in said steps and, as we have seen, in the court's verbal admonition to mother on March 18, 1998, three weeks prior to Michael's removal, was the requirement that Terri M. cooperate with the department and the providers of the many services made available to mother before and after Michael's removal. Chief among the court-ordered requirements was that mother participate in the psychological evaluation to be conducted by Mantell. The recommendations which would have resulted from that evaluation might have provided the court, the petitioner and mother with a possible plan for reunification and was a court-ordered pre-requisite for any resumption of visitation. Mother failed to appear not once but twice for said evaluation. In order to take advantage of any remaining opportunity, however slight, to re-unify with Michael mother first was required to take the necessary steps to re-gain the opportunity to visit with her child. This, mother chose not to do.
Mother claims in her brief that petitioner made no efforts to reunify her with Michael. No classes were offered as to the CT Page 3581 proper care and feeding of the child prior to his removal and no services were offered after his removal. This court has earlier described the numerous services offered to mother prior to Michael's removal including social worker services, nursing services, transportation, counseling services, parenting classes, domestic violence and substance abuse groups. Petitioner, despite the plan of termination, on numerous occasions, arranged such services for mother after Michael's removal, some of which were not engaged by mother until five months after his removal and then from September to December 1998, only. Mother has accessed no services since then. This court does find by clear and convincing evidence that petitioner has made reasonable efforts to reunify Terri M. with Michael, however, despite such efforts, mother has clearly demonstrated her unwillingness and inability to benefit therefrom.
VI. DISPOSITION
The court, having found that Michael M. was as of April 9, 1998, a neglected child and having found as of July 9, 1999, that he was uncared for and having found that the statutory grounds alleged as the basis for terminating mother's parental rights have been proven, must now turn to the dispositional phase of this case in which the issue of Michael's best interest is the primary consideration. In deciding whether the termination of the parental rights of Terri M. is in Michael's best interest, the court is permitted to consider all events which occurred prior to the date of the dispositional hearing, including those which may have occurred after the date on which the termination petition was filed. In re Tabitha P., 39 Conn. App. 353, 367 (1995); In reKasheema L., 56 Conn. App. 484, 488 (2000). The court is also mandated to consider the social study (Exhibits — State's #22 and #23.) prepared by petitioner prior to making any disposition. Practice Book § 33-5. Since the trial concluded on August 6, 1999, that is the dispositional date.
The central issue which must be decided by the court in considering what is best for Michael is whether terminating his mother's parental rights under circumstances which preclude termination of his father's parental rights is, nevertheless, in said child's best interest. Should the court based on all of the evidence terminate the parental rights of one parent when it cannot do so relative to the other? The court clearly has the authority to do so. See General Statutes § 17a-112 (g); In reTheresa S., supra, 196 Conn. 18. The Appellate Court, in the CT Page 3582 recent case of In re Michael L., 56 Conn. App. 688 (2000) upheld the trial court's termination of mother's parental rights when unable to terminate those of the father who was incarcerated out of state. In response to the constitutional challenge made by mother, the appellate court agreed that there was clear and convincing evidence that contact with her children would be detrimental to them, the court stated:
 Furthermore, there is no authority to support the claim that the respondent has a fundamental right to maintain her parental rights where the father's rights have not been terminated.
Id., 699-700.
Section 17a-93 (e) of the General Statutes defines "termination of parental rights" as:
 [T]he complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent or parents so that the child is free for adoption. . . .
(Emphasis added.)
 In contrast to custody proceedings, in which the best interests of the child are always the paramount consideration and in fact usually dictate the outcome, in termination proceedings the statutory criteria must be met before termination can be accomplished and adoption proceedings begun.
(Emphasis added.) In re Eden F., 250 Conn. 674, 689 (1999).
The statutory and case citations quoted above clearly indicate that adoption usually results from the termination of parental rights and, most often, is the motivation for the filing of a petition seeking termination. Respondent mother, in In re TheresaS., supra, 196 Conn. 30, therefore, argued that since no adoption was possible as the natural father's rights were not terminated, it made "no sense to sever permanently the ties between [her] and her children." (Emphasis added.) She also argued that the trial court was illogical in its conclusion that termination was in the children's best interest without also ordering that the children be placed for adoption. See id. The court, while agreeing with CT Page 3583 the respondent that termination of parental rights is part of the adoptive process and that adoption cannot proceed unless the parents' rights are first terminated, states:
 The converse is not true. The parents' rights can be terminated without an ensuing adoption. When both parents' rights are terminated, it becomes the obligation of the state to look for permanent placement for the child or children. Adoption is the most appropriate solution unless family members such as grandparents, aunts, uncles, brothers, sisters, etc., are available to act as surrogates on either a temporary or permanent basis. Although petitions for termination are presumably seldom brought unless prospective adoptive parents are available; In re Juvenile Appeal (Anonymous), 177 Conn. 648, 673, 420 A.2d 875 c(1979); it is clear that there are circumstances wherein termination of a parent's rights is not followed by adoption.
(Emphasis added; citation omitted.) Id., 30-31.
Justice Palmer, writing for the majority in In re Eden F., supra,250 Conn. 709, states:
 [a]lthough subsequent adoption is the preferred outcome for a child whose biological parents have had their parental rights terminated; In re Juvenile Appeal (83-BC), 189 Conn. 66, 79, 454 A.2d 1262 (1983); accord In re Baby Girl B., 224 Conn. 263, 274, 618 A.2d 1 (1992); it is not a necessary prerequisite for the termination of parental rights. While long-term stability is critical to a child's future health and development; In re Romance M., 229 Conn. 356; adoption provides only one option for obtaining such stability.
(Emphasis added.)
"The trial court is vested with broad discretion in determining what is in the child's best interest." (Citations omitted, internal quotation marks omitted.) Schult v. Schult,241 Conn. 767, 777-78 (1997). "The analysis of this critical issue is not restricted to a compelling reason or to filly reuniting a parent and child." In re Alissa N., 56 Conn. App. 203, 208 (1999). "A broad analysis is required to enable the court to exercise its discretion based upon a variety of considerations." In re BruceR., 234 Conn. 194, 206 (1995). CT Page 3584
In this case, respondent mother argues that it is not in Michael's best interest, at this time, to terminate her parental rights. She argues that no pressing need presently exists requiring termination. Since Michael will not be freed up for adoption, his placement will not change and he will not suffer in any way. Petitioner, supported by father and the child's attorney, argues that termination of mother's parental rights at this time, while not allowing for Michael's adoption will, nevertheless, accomplish a major step toward his permanent placement. Petitioner points out that Federal mandates will no longer allow the child to linger in the foster care system as permanency planning must commence in April of this year.[10]
Petitioner further argues that allowing Terri M. additional opportunities to engage the services essential to Michael's proper care when it has been shown, and this court has so found, that she is unable and unwilling to benefit from such services will ultimately work against providing permanency for Michael.
The case of In re Theresa S., supra, 196 Conn: 18, involved two children, one aged two years, the other, four months, whose wrists were cut by their mother who also tried to kill herself; this tragedy occurred while the father, ignoring signs of imminent disaster, went bowling. Immediate and decisive medical intervention placed the children out of danger within 48 hours. The trial court adopted the recommendations of the trial referee and, although finding that both parents had neglected their children, terminated mother's parental rights only. The court concluded that any situation which permitted mother to play an active role in the lives of the children would pose an immediate threat to their physical integrity and found that re-entry of their mother into their lives was not in the children's best interest. Justice Santaniello, noted that the trial court clearly considered the large degree to which mother's actions adversely affected her children's physical, emotional and psychological well-being, and found that the evidence overwhelmingly supported the trial court's decision. Id., 29. Noting, inter alia, mother's lack of stability, the trauma of the attack upon her children, the permanent damage to the children (particularly, the oldest who recalled the attack) and the continuous supervision and therapeutic maintenance required of mother, Justice Santaniello agreed that her children would be at great risk. Id., 29-30. The supreme court concluded:
 The welfare of the child is the most important factor to be CT Page 3585 considered, and each set of individual circumstances will dictate the end result. In this case, the trial court's decision not to terminate the father's parental rights eliminated consideration of the adoption process.
Id., 31.
After a careful consideration of all of the relevant circumstances of this case as evidenced by the testimony and exhibits, this court finds, by clear and convincing evidence, that termination of the parental rights of Michael's mother, Terri M., is in his best interest. After receiving the parental "wake-up call" that her first child had been neglected by her thus placing his health, safety and future development at great risk, Terri M. refused to follow the court charted course to have that child returned to her and proceeded to give birth to her second child, Michael M. She lost her state aid and failed to pursue reinstatement of those benefits. Her residence, not obtained until Michael was nearly a month old, was kept in deplorable condition. She avoided her caseworker and ignored the court's reminder to cooperate with the department and access services. When visited by department personnel, such visits prompted by the department's concern for her son's welfare, she was secretive and deceitful as to her intentions regarding her son's medical care. When, at the insistence of department personnel, she did access such care, she avoided having him followed by the same physician and engaged, at great risk to Michael, in the doctoral "shell game" earlier referred to. She failed to inform department and medical personnel of the medical diagnosis of failure to thrive and did not seek the immediate medical attention recommended for Michael, delaying the same for eleven days — a delay which could have resulted in the death of her son. Finally, she nearly literally starved her son to death, greatly contributing to his current developmental deficits.
After the removal of her second child, she again ignored specific steps issued by the court, failing to cooperate with petitioner to utilize needed counseling, parenting, domestic violence and substance abuse services until five months after Michael's removal, and then for four months only thereafter. She has not participated in any services since December 1998. Moreover, she completely ignored two court ordered psychological evaluations the purpose of which was to chart, at the very least, a visitation course, failing to appear each time. Having failed to follow that course relative to Michael, on January 27, 1999, CT Page 3586 Terri M. gave birth to a third son, Xavier, only to have him removed from her care amid her probation officer's concerns as to her unsanitary and unclean residence and the concern of medical personnel as to her ability to care for a newborn. Deplorable living conditions were also observed on April 26, 1999 — three months after the removal of her third child.
Given mother's unstable life-style; given the fact that after she neglected one child, she nearly caused the death of her second child by starving him with resultant long term developmental deficits; given Michael's fragile medical condition which requires constant vigilance and a super clean environment; and given respondent mother's failure to follow court orders issued in her children's best interest, this court finds that any eleventh hour attempt to reintroduce Terri M. into Michael's life would, once again, place said child at great risk and would be contrary to his best interests.
Michael's chances of placement in a loving, caring, nurturing and safe permanent home will not be unduly impaired by this one parent termination. He will not be lost and forgotten in the foster care system as his need for permanency must and will be addressed. As stated, a permanency plan is due on April 9, 2000. Father, after considering Michael's fragile condition and the resultant extraordinary care required and after considering his current incarceration and the difficult road to rehabilitation to be traveled when released, may very well decide that termination of his parental rights is in his son's best interest. Whether he consents to such termination, petitioner is mandated to file a petition to seek termination of his parental rights once Michael has been in petitioner's custody for fifteen consecutive months, i.e., July 9, 2000. General Statutes § 17a-111a (a) (1). Father cannot sit idly by behind prison walls and expect that when he is ready to reunite with Michael, Michael will be available. Services must be accessed by father whether he is in or out of prison; such services will be limited as to time as Michael's need for permanency becomes the paramount consideration.
VII. THE MANDATORY FINDINGS
The court makes the following factual findings required by General Statutes § 17a-112 (d):
1. Timeliness, nature and extent of services offered:
CT Page 3587
Appropriate and timely services were provided by petitioner both prior the Michael's removal from his mother's care and subsequent thereto including social worker services, nursing services, case management, transportation, drug and individual counseling services, psychological evaluations and parenting classes. Prior to Michael's removal mother's refusal to cooperate with the department and to employ those services essential to said child's health and safety contributed greatly to the failure to thrive diagnosis and nearly killed said child. After Michael's removal, despite the department's plan of termination of mother's parental rights, such services were continually made available to her. Her minimum participation in the Women's Group and Family Ties five months after Michael's removal and twelve months after the removal of her first child, Marcus, falls far short of what respondent mother needed to do to have any chance of reuniting with Michael. Given mother's history vis-a-vis the services offered, the allowance of any further time or the provision of any further services would be detrimental to Michael's best interests.
2. Reasonable efforts to reunite:
As indicated earlier numerous services were offered to Terri M. in an effort to prevent Michael's removal and, this court has found, despite the pendency of the termination petition, many services were offered subsequent to his removal. Mother continuously thwarted efforts by the department to provide essential services to her and has clearly and convincingly demonstrated her unwillingness and inability to benefit from such efforts.
3. Fulfillment of court-ordered obligations:
Terri M. had failed to comply with the court-ordered expectations (Exhibit — State's #3) that had been issued in Marcus' case which greatly contributed to Michael's removal. She then failed to comply with the court-ordered steps (Exhibit — C-1) issued in this case. She also failed to obey the court order that she undergo a psychological evaluation, not once, but twice. The steps are statutorily mandated and compliance therewith is essential to reunification of parent and child. In re ShylieshH., supra, 56 Conn. App., 179.
4. The feelings and emotional ties of the child with respect toCT Page 3588his parents, any guardian of his person and any person who hasexercised physical care, custody or control of the child for atleast one year and with whom the child has developed significantemotional ties.
Neither mother nor father are able to provide Michael with a safe environment. At Michael's birth in February 1998, mother was homeless. She allowed the great-aunt to financially support herself and the baby until Michael was about one month old. During that time, mother missed medical appointments, did not locate stable housing, did not secure income, and failed to participate in her services designed for reunification with her first child. The department attempted to address mother's behavior. Mother found an apartment in mid March 1998. Mother did not engage in services or follow through with Michael's medical needs, resulting in Michael having severe failure to thrive. He was starved and malnourished by mother. While in mother's care, mother failed to meet his most basic need for food, thus causing a serious disruption in the attachment/bonding cycle and seriously impairing his health and future development. Respondent mother has not seen her child since April 1998, and has failed to take the minimum steps necessary in order to regain any opportunity to see Michael, i.e., participation in the court-ordered psychological evaluation. Any future contact between Michael and his mother would be detrimental to said child.
Father has never had any contact with Michael. He failed to contact the department before the coterminous petitions were filed. Father has been sentenced to several years in prison. He has engaged in chronic antisocial behaviors. He continued to sell drugs from his home knowing that mother was pregnant and both guns and drugs were kept within easy reach of mother's oldest child, then age two.
Michael does not have any ties to mother or father.
5. The age of the child:
Michael has been in the petitioner's care since he was seven and one-half weeks old. He has been in his current specialized foster home since he was removed from mother's care. He has recently passed his second birthday. Neither mother nor father are any closer to gaining the ability to properly care for him, especially considering his special needs, than they were when the CT Page 3589 department assumed responsibility for his care. The current foster family has provided Michael with the nurturing, caring and protective environment which was so sorely lacking when respondent mother was responsible for his care. Mother and father are totally incapable of providing for the daily needs of their two year old medically fragile child.
6. Efforts of parents to adjust their circumstances, conduct orconditions:
Mother has not made any significant efforts to adjust the circumstances or conditions or the conduct which precipitated the removal of all three of her children in succession. When Michael was in the care of Terri M. he was severely malnourished and nearly starved to death while mother, through negligence, deceit and artifice refused to utilize the services made available to her and her child by the department. After Michael's removal not only did she continue to decline services but refused to follow court orders purposed to improve her child-caring capabilities (for a second time) and ignored court orders the purpose of which was to make it possible to visit said child. In January 1999, nine months after Michael's removal and fourteen months after Marcus' removal, her third child, Xavier S., was removed due to the deplorable living environment maintained by respondent mother. Mother due to her choice to ignore court orders has not seen Michael since his removal in April 1998. Mother has not contacted her caseworker and has made no inquiry of the department as to the health of her medically fragile child. Father has been incarcerated since five months prior to Michael's birth and is presently at Gamer Correctional Facility, a maximum security prison, due to his extensive criminal history and dangerous associations. Prison services are, therefore, limited. Given father's juvenile and adult criminal activity, poor judgment and lack of parenting skills it appears that he too, to paraphrase Bailey, would not be an "ideal candidate" to meet on a daily basis the many special needs of his son. Father's sentence, if fully served, will not expire until December, 2002. Father would do well to carefully consider what is best for Michael's future.
7. Prevention of meaningful relationship by others:
The only obstacles which have prevented mother and father from creating and/or maintaining any relationship with Michael have been supplied by his parents. Father's criminal behavior and CT Page 3590 dangerous lifestyle resulted in his arrest and incarceration five months prior to Michael's birth. Mother's substance abuse, anti-social practices, and virtually non-existent parenting abilities nearly caused Michael's death and severely, adversely impacted his future development. The lack of a meaningful relationship between Michael and his parents resulted from the poor life choices made by the parents and was not due to the unreasonable interference of anyone else, including the petitioner. In re Samantha B., 45 Conn. Sup. 468, 480 (1998), affd 51 Conn. App. 376 (1998), cert. denied, 248 Conn. 902
(1999).
VIII. CONCLUSION:
After carefully examining the exhibits introduced into evidence, after carefully considering the testimony of each of the witnesses and reading the briefs submitted by counsel, this court concludes and finds that:
(1) Michael M. is a neglected child;
(2) Michael M. is an uncared for child;
 (3) Michael M. was denied by reason of acts of commission and omission of his mother, Terri M., the care, guidance and control necessary for his physical, educational and emotional well-being;
 (4) Considering the totality of the circumstances, a waiver of the previously provided statutory one-year requirement is necessary to promote Michael's best interest;
 (5) Despite reasonable efforts by the department of children and families to prevent Michael's removal and despite such efforts to provide services necessary for any reunification, respondent mother has clearly demonstrated her unwillingness and inability to benefit from such efforts;
 (6) It is in Michael's best interest that the parental rights of respondent mother be terminated;
 (7) In making the determination to terminate mother's parental rights the court has carefully considered, in addition to the evidence, the statutory factors; CT Page 3591
 (8) Michael M. shall be committed to the care and custody of the Commissioner of Children and Families for the maximum statutory period;
 (9) Effective upon said commitment, the order of temporary custody shall be vacated.
In the interest of achieving permanency for Michael, who has been in foster care for eleven months, and in recognition of federal and state mandates to diligently and timely pursue that goal, this court urges Michael's counsel to diligently monitor father's compliance with the steps to be ordered as hereinafter provided and the department's compliance with applicable statutes governing permanency planning.
IX. ORDERS:
Based on the foregoing findings, it is:
ORDERED that Michael M. is hereby adjudicated a neglected and uncared for child;
ORDERED that the parental rights of Terri M. be and are hereby terminated;
ORDERED that, effective on the filing of this memorandum, the order of temporary custody entered on April 9, 1998, is hereby vacated and Michael is hereby committed to the commissioner of children and families for the maximum period of twelve months.
ORDERED that an in-court review shall be held on a date to be set by the court services officer who shall, prior thereto, in consultation with counsel for father, child and the petitioner prepare specific steps for father pursuant to § 46b-129 (j), said steps to be ordered by the court in father's presence;
ORDERED that at the time of said in-court review, the court will set specific dates to assure full compliance with the applicable statutes relative to permanency planning.
Wilson J. Trombley, Judge.
[2] Although not offered as an exhibit at trial, the court will take judicial notice of a report from Laboratory Corporation of America dated June 5, 1998, and filed with the court on June CT Page 3592 11, 1998, which concludes that the probability of Michael H. being the father of Michael M. is 99.67%, a percentage in excess of the numerical presumption provided in General Statutes § 46b-168
(b).
[3] See Memorandum of Decision Re: Respondent Father's Motion to Strike dated February 11, 1999, and filed February 16, 1999.
[4] The amendment was filed on June 2, 1999, and the order signed by this court on July 9, 1999.
[5] The amended schedule was as follows:
 petitioner's brief — 11/15/99 respondent mother and child's brief — 12/8/99 respondent father's brief — 12/10/99 petitioner's reply brief — 12/24/99
[6] The motion was filed by mother, however, she requests that Xavier's guardianship be transferred to his father.
[7] Public Act 98-241, Section 8 eliminated the requirement provided in § 17a-112 (c) that the statutory ground alleged by petitioner in this case, i.e., subparagraph (3) (C), be found to have existed for over a period of one year and also eliminated the provision in former paragraph (d) allowing the court, based on certain findings, to waive the so called "one year requirement." Section 8 of that act took effect on July 1, 1998. The termination petition was filed on April 9, 1998, thus, the one year requirement and waiver provisions formerly provided in General Statutes § 17a-112 do apply and will be considered by this court.
[8] See Public Act 98-241, Section 8.
[9] See footnote #7.
[10] The department of children and families must file a permanency plan on or before April 9, 2000 — twelve months from the issuance of the order of temporary custody. General Statutes § 46b-129 (k) (1).